Richard Edwin SMITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–91–00195–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

April 21, 1994.

Rehearing Denied July 21, 1994.

Brian W. Wice, Houston, for appellant.

John B. Holmes, Jr., Winston E. Cochran, Jr., Joe Owmby, Tracy Tirey, Harris County, for appellees.

Before OLIVER–PARROTT, C.J., and MIRABAL and PRICE,[1] JJ.

## OPINION

OLIVER–PARROTT, Chief Justice.

This is an appeal from a conviction for murder. Appellant, Richard Edwin Smith, a juvenile, was certified to stand trial as an adult. A jury found appellant guilty, and assessed punishment at 99–years confinement and a fine of $10,000. We affirm.

**Background**

On November 20, 1989, the body of Katrina Stonecipher was discovered in an open

---

1. The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

field in Pasadena, Texas. The next day, at approximately 12:00 p.m., as part of the investigation into the death of Stonecipher, two officers with the Pasadena police department, James Baird and R.J. Johnston, met appellant at his mother's place of business. The officers told appellant they wanted to talk with him about Stonecipher's death and asked if he would accompany them to the police station. Appellant agreed and went with the officers to the Pasadena police station.

Upon arriving at the station, appellant was taken to the juvenile division. At 1:36 p.m., appellant appeared before a municipal judge who advised him of his rights as a juvenile. *See* TEX.FAM.CODE ANN. § 51.09(b) (Vernon Supp.1994).[2] Following the warnings, appellant was taken to the detective division to be interviewed by Sergeant Vaughn, a detective with the Pasadena police department, and Kelly Reed, a juvenile division officer. Appellant orally related his version of the events leading to Stonecipher's death. After appellant's statement was reduced to writing, the judge was contacted for a second appearance. *See* TEX.FAM.CODE ANN. § 51.09(b) (Vernon Supp.1994). Because representatives of the news media had gathered at the municipal court, the judge went to the police station to meet privately with appellant. Appellant signed his confession at 5:00 p.m.

According to appellant's written confession, the facts of the case are as follows: Sean Beaubien was angry at Stonecipher because she had stolen some property from him. In the early morning hours of November 20, 1989, appellant and Kevin "Ponytail" Drake visited Beaubien and T.J. Arnold at Beaubien's house. Stonecipher was planning to come over later, and Beaubien suggested that they physically assault her. Drake was to hit Stonecipher on the head with a hammer, and appellant would cut her throat with a knife. When Stonecipher arrived, everyone went into a field located near Beaubien's house. According to appellant, Stonecipher had been suggesting that she could have sexual intercourse with all of them. After

Stonecipher refused appellant's initial sexual advances, the others began urging appellant to "do it." Arnold then grabbed Stonecipher's arms while appellant cut her throat. Stonecipher fought appellant and temporarily disarmed him. After Arnold secured her, appellant backed up, closed his eyes, and swung the knife and stabbed her in the back. Appellant tried to pull the knife out, but could not because it was "stuck." When he finally was able to pull the knife from her back, he cut his left small finger. At this point, the others ran, but decided to return and make sure that Stonecipher was dead. Appellant stated he did not accompany them. Arnold took the knife from him and returned with the others.

At trial, Beaubien testified that on the evening of November 19, 1989, he and Arnold were at his house cleaning a deer. At approximately 1:00 a.m., appellant and Drake arrived. Stonecipher telephoned Beaubien to tell him she was coming over. When Beaubien mentioned that Stonecipher was coming over, appellant jokingly said, "let's kill her." According to Beaubien, appellant suggested the boys tape the ends of their fingers so there would be no fingerprints. Beaubien testified he participated and taped his fingers also because "the other boys were doing it." When Stonecipher arrived, the group went into the field. Beaubien further testified that, after appellant walked up behind Stonecipher and cut her throat, Beaubien became scared and ran. Appellant eventually caught up with him and attempted to hand him the bloody knife, which he refused to take. Arnold took the knife back to Beaubien's house.

At trial, Arnold testified that some 15 minutes after the group was in the field, appellant gave him a hammer and told him to hit Stonecipher on the head. Arnold refused and threw the hammer down on the ground. According to Arnold, appellant then walked up behind Stonecipher and cut her across the throat with the knife. Appellant stabbed her in the shoulder and back repeatedly. Ac-

---

**2.** TEX.FAM.CODE ANN. § 51.09 renders a statement involuntary unless a juvenile, "who is in a detention facility or other place of confinement or in custody of an officer," has at some time, prior to the making of the written statement received Miranda warnings from a magistrate with no law enforcement officers or prosecuting attorney present.

cording to Arnold, it was at this point that he became scared and ran, but was stopped by appellant who told him that Stonecipher was not dead. Appellant told him that he had to go back and kill her, or he would go to jail. Arnold testified that appellant began chasing Stonecipher with the knife, and after tripping her, continued stabbing her in the back. As Arnold ran back toward Beaubien's house, he caught up with Beaubien, who had fled when appellant first cut Stonecipher's throat.

In 10 points of error, appellant asserts the trial court erred in denying a motion to suppress his written and oral statements, in denying his request for a jury charge on the lesser included offenses of attempted murder, aggravated assault, and voluntary and involuntary manslaughter, in overruling his motion for mistrial after the prosecutor urged the jury to consider application of parole laws in final argument, and in permitting the jury to take notes. Appellant also argues the evidence is insufficient to support the conviction.

## Motion to Suppress

In his first two points of error, appellant argues the trial court erred in denying a motion to suppress his written and oral statements made to Vaughn and Reed. Appellant contends that his oral and written statements were given to the officers while in "custody" and, thus, his oral statement is inadmissible pursuant to Tex.Code Crim.P. art. 38.22 (Vernon Supp.1994), and his written statement is inadmissible pursuant to Tex.Fam. Code Ann. § 52.02(a)(2)(3) (Vernon Supp. 1994).[3]

■ Issues regarding a confession of a juvenile, though raised in a criminal forum, are controlled by the applicable provisions of the Family Code. *Griffin v. State,* 765 S.W.2d 422, 427 (Tex.Crim.App.1989). Therefore, when a juvenile is in custody, the requirements of the Family Code must be complied with. *Comer v. State,* 776 S.W.2d 191, 194 (Tex.Crim.App.1989). A juvenile's confession, if illegally taken, cannot be admit-

ted against him in a subsequent criminal trial, consistent with Tex.Code Crim.P. art. 38.23 (Vernon Supp.1994). *Comer,* 776 S.W.2d at 194.

In *Comer,* the court addressed whether a juvenile defendant's confession taken before the requisites of section 52.02(a) had been met, must be suppressed. *Comer,* 776 S.W.2d at 193. In *Comer,* a juvenile defendant was taken by officers to the home of a justice of the peace who cautioned him in compliance with Tex.Fam.Code Ann. § 51.09 (Vernon Supp.1994).[4] Three hours later, after the defendant gave a full confession that was committed to writing, he was returned to the home of the justice of the peace where he signed the written confession. In construing section 52.02(a), the court stated that section 52.02(a) "means what it certainly seems to say—that its provisions will be complied with "immediately" and "forthwith" upon taking a child into custody." *Comer,* 776 S.W.2d at 194. In the court's view, the legislature intended that the officer designated by the juvenile court make the initial decision whether to subject a child to custodial interrogation. *Id.* at 196. The court stated the officers willfully violated the law in taking upon themselves the decision to interrogate appellant before they brought him to the detention facility. *Id.* at 197. The court ultimately held that in detaining the juvenile defendant for the approximately three hours it took to obtain his confession, the officers violated section 52.02(a), notwithstanding the provisions of section 51.09(b)(1). *Comer,* 776 S.W.2d at 196.

Appellant, relying on *Comer,* argues that his written statement is not admissible because he was not taken directly to a juvenile detention facility or before an officer or official designated by the juvenile court as required by section 52.02(a)(2) and (3), which states that:

(a) A person taking a child into custody, without unnecessary delay and without first taking the child to any place other than a juvenile processing office desig-

---

**3.** At trial, sergeant Vaughn related appellant's oral statements, which were simultaneously reduced to writing. Vaughn testimony is consistent with appellant's written statement.

**4.** Tex.Fam.Code Ann. § 51.09(b)(1) (Vernon Supp. 1994) states that certain warnings must be given to a juvenile for a subsequent statement to be admissible.

nated under Section 52.025 [5] of this code, shall do *one* of the following:

(2) Bring the child before the office or official designated by the juvenile court if there is probable cause to believe that the child engaged in delinquent conduct or conduct indicating a need for supervision;

(3) Bring the child to a detention facility designated by the juvenile court.

Tex.Fam.Code Ann. § 52.02(a)(2), (3) (Vernon Supp.1994).

In the instant case, the record reflects the requisites of section 52.02 were complied with before taking appellant's statement. Appellant was taken directly to the Pasadena police department, which is a designated facility for the temporary detention of juveniles consistent with section 52.025(a). *See* Tex.Fam.Code Ann. § 52.025(a) (Vernon Supp.1994). At the suppression hearing, an "addendum to the Harris County juvenile court guidelines" was admitted into evidence. The guidelines, approved by the juvenile court, specifically designate the Pasadena police station. Joseph Fuenges, the district court administrator for the Harris County juvenile trial division, also testified that the Pasadena police department has been properly designated pursuant to section 52.025(a).

Moreover, the judge who administered appellant's warnings testified that he had been designated by the juvenile courts as an official, consistent with section 52.02(a)(2) before whom juveniles may be brought when taken into custody. The judge also testified that as part of his official duties as a designated official, he administers warnings to juveniles as required by the Family Code.

The judge further stated that he met appellant for the first time at 1:36 p.m., to administer warnings in compliance with Tex. Fam.Code Ann. § 51.09(b), which provides that certain warnings must be given to a juvenile for a subsequent statement to be admissible. *See* Tex.Fam.Code Ann. § 51.09(b)(1) (Vernon Supp.1994). Before the warnings were administered, appellant was told by the judge that he was accused of murder. The document signed by appellant, which was admitted into evidence, acknowledging that warnings were given, reflects the same. After the warnings were administered, appellant was interviewed by Vaughn and Reed. After appellant's statement was reduced to writing, appellant went before the judge for a second appearance, consistent with section 51.09(b).

Thus, unlike the circumstances in *Comer,* the officers in the instant case did not take it upon themselves to interrogate appellant without first complying with the requirements of the Family Code. We therefore find that the trial court did not err in admitting appellant's written and oral statement.

Appellant's first and second points of error are overruled.

**Jury charge**

In his third, fourth, fifth, and sixth points of error, appellant argues the trial court erred in denying his request for a jury charge on the lesser included offenses of attempted murder, aggravated assault, voluntary manslaughter, and involuntary manslaughter.

Consistent with Tex.Penal Code Ann. § 19.02(a)(1) and (a)(2) (Vernon 1989), appellant was indicted for murder. The indictment alleged that appellant intentionally and knowingly caused the death of Stonecipher by stabbing her with a deadly weapon, namely, a knife. Under a separate paragraph, appellant was also indicted for intending to cause serious bodily injury to Stonecipher and causing her death by intentionally and knowingly committing an act clearly dangerous to human life, namely, by stabbing Stonecipher with a deadly weapon, namely, a knife.

**Standard of review**

Merely because a lesser offense is included within the proof of a greater offense does not always warrant a jury charge on the lesser offense. *Lincecum v. State,* 736

---

**5.** Tex.Fam.Code Ann. § 52.025(a) (Vernon Supp. 1994) provides, in relevant part, that the juvenile court may designate an office or a room, which may be located in a police facility or sheriff's offices, as the juvenile processing office for the temporary detention of a child taken into custody under section 52.01.

S.W.2d 673, 681 (Tex.Crim.App.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988). In *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981), the court established a two-step analysis to determine whether a defendant should receive a charge on a lesser included offense. First, the lesser included offense must be included within the proof necessary to establish the offense charged. Secondly, there must be some evidence in the record that if the defendant is guilty, he is guilty of *only* the lesser included offense. *Id.* The credibility of the evidence and whether it is controverted or conflicts with other evidence may not be considered in determining whether the charge on the lesser offense should be given. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim.App.1992).

To establish the first prong of the *Royster* test, we look to the definition of a lesser included offense as set out in TEX.CODE CRIM. P.ANN. art. 37.09, which states:

> An offense is a lesser included offense if:
> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX.CODE CRIM.P.ANN. art. 37.09 (Vernon 1981).

### Attempted murder

■ Attempted murder is a lesser included offense of murder because it meets article 37.09(4) above. Therefore, the first prong of *Royster* is established. The question then is whether there is evidence that appellant, if guilty, is guilty only of the lesser included offense of attempted murder. Appellant contends the second prong has been met because of Beaubien's testimony, and segments in his written statement, which were admitted into evidence. Specifically, appellant points first to Beaubien's testimony that Stonecipher appeared to be alive after appellant pulled the knife across her throat. Appellant also cites us to the following segments of his written statement where he stated that he: ran up to [Stonecipher] and tried to cut her throat; backed up and closed my eyes and swung the knife; pulled the knife out of [Stonecipher]; and that he [was] sorry for what happened and would never intentionally kill someone. Appellant thus asserts this evidence shows that if he is guilty, he is guilty of only the lesser offense of attempted murder. We disagree.

■ In deciding whether the second prong of the *Royster* test has been met, we must consider all the evidence raised at trial. If evidence from any source raises the issue, and a jury charge on the issue is properly requested, the issue must be submitted to the jury. *Thomas v. State*, 701 S.W.2d 653, 656 (Tex.Crim.App.1985). Appellant's selected portions of his written statement must be placed in context with his entire statement. While appellant stated it was Arnold who returned to complete the killing, appellant's own testimony of his conduct that night indicates it also was his intent to cause the death of Stonecipher.

> We then walked out into the field ... everybody kept coming up to me telling me to "do it, man, do it." I pulled the knife out of my pocket ... Ponytail was suppose to hit her on the head with a hammer. We had planned to do this all along when we were at Sean's house. T.J. talked to me and asked me to do it, telling me that he would help me if I tried to cut her throat ... T.J. went up to Katrina and grabbed her arms. He started telling me to "do it." I ran up to Katrina and tried to cut her throat ... I backed up and closed my eyes and swung the knife. The knife stuck somewhere in her back ... I tried to pull the knife out but it was stuck. I pulled the knife out ... we all started running. The three of us stopped and decided we had to kill her ... All we wanted to do was teach her a lesson.

Appellant's claim, that testimony establishing Stonecipher was still alive after he cut her throat helps establish the second prong of *Royster*, is incorrect. While such conduct certainly indicates an intent to kill, it will not support a charge, in this case, for attempted murder. The cause of death was alleged to be "stabbing" not "cutting," with a knife. Because appellant's conduct admittedly included stabbing in the back, with such force that removal of the knife was difficult, appellant would be entitled to a charge for attempted murder only if this conduct did not produce an injury that resulted in death.

The medical examiner testified Stonecipher suffered, among other injuries, a cutting wound to the throat and 10 stab wounds, five in the head, three in the neck, and two in the back. He stated the two stab wounds in the back were a cause of death. The medical examiner testified that, in his opinion, the knife used to inflict these wounds was a deadly weapon, could cause serious bodily injury, and the use of the knife was an act clearly dangerous to human life.

The offense of criminal attempt is committed if, with specific intent to commit an offense, a person does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended. TEX.PENAL CODE ANN. § 15.01 (Vernon Supp.1994). There is no evidence appellant inflicted a stab wound that was intended to cause death but failed. Appellant's intent and desire to cause Stonecipher serious bodily injury by committing an act clearly dangerous to her life causing her death is clear from the record. This conduct is murder. *See* TEX.PENAL CODE ANN. § 19.-02(a)(2) (Vernon 1989). There is no evidence in the record that appellant, if guilty, is guilty *only* of attempted murder. Therefore, the trial court did not err in refusing appellant's requested jury charge on the lesser included offense of attempted murder.

### Aggravated assault

■ Aggravated assault is a lesser included offense of murder. *Coit v. State*, 629 S.W.2d 263, 265 (Tex.App.—Dallas 1982, pet. ref'd). Therefore, the first prong of *Royster* is established. The question then is whether there is evidence that appellant, if guilty, is only guilty of the lesser included offense of aggravated assault. Again, appellant asserts that Beaubien's testimony and his written statement is ample evidence from which a rational jury could have found appellant merely intended to cause serious bodily injury, while acquitting him of murder. We disagree.

Section 22.02(a)(1), of the Texas Penal Code states, in relevant part, that aggravated assault is committed when a person causes serious bodily injury to another. *See* TEX.PENAL CODE ANN. § 22.02(a)(1) (Vernon 1989). As noted above, appellant was indicted for murder by intending to cause serious bodily injury to Stonecipher by intentionally and knowingly committing an act clearly dangerous to human life that caused her death, namely, by stabbing Stonecipher with a deadly weapon, namely, a knife. *See* TEX.PENAL CODE ANN. § 19.02(a)(2) (Vernon 1989). The record shows evidence from which the jury could have inferred the intent to cause serious bodily injury, an element of both murder and aggravated assault. The manner in which appellant stabbed Stonecipher is clearly dangerous to human life and contributed to the cause of the death of Stonecipher. Appellant's conduct is murder under section 19.02(a)(2). Thus, there is no evidence in the record from which the jury could have concluded that appellant, if guilty, was guilty *only* of aggravated assault. The second prong of the *Royster* test is not established. The trial court did not err in refusing appellant's request for a jury charge on the lesser included offense of aggravated assault.

### Voluntary manslaughter

■ In a murder case, a charge on voluntary manslaughter should be given only when there is evidence the defendant acted intentionally but under the immediate influence of sudden passion arising from adequate cause. *Hobson v. State*, 644 S.W.2d 473, 477 (Tex. Crim.App.1983). Sudden passion must be directly caused and arise out of provocation by the deceased at the time of the offense. *Marras v. State*, 741 S.W.2d 395, 405 (Tex. Crim.App.1987). Adequate cause is something that would ordinarily produce a degree of anger, rage, resentment, or terror in a

person of ordinary temper, sufficient to render the mind incapable of cool reflection. *Id.*

■ Appellant asserts that he is entitled to a charge on the lesser included offense of voluntary manslaughter because of the following evidence from his written statement: "[b]efore I cut Katrina, she had been tripping out by cussing us and coming on to us. She seemed to be going from one trip to another. She pulled my hair once when she was cussing me. . . ." Appellant also stated: "I'm sorry for what happened and would never intentionally kill someone."

The evidence in the record is insufficient to show sudden passion or adequate cause. Stonecipher's conduct, "cussing" and "pulling hair," is not conduct that would ordinarily produce a degree of anger, rage, resentment, or terror in a person of *ordinary temper,* sufficient to render the mind incapable of cool reflection. *See McCartney v. State,* 542 S.W.2d 156, 160–61 (Tex.Crim.App.1976); *see also Lopez v. State,* 716 S.W.2d 127, 129 (Tex.App.—El Paso 1986, pet. ref'd) (defendant must be in throes of actual, subjective passion). Thus, even if appellant was "mad" at Stonecipher, this does not indicate a great degree of passion or a level of emotional response which would have cause a person of ordinary temperament to be incapable of cool reflection. *Lopez,* 716 S.W.2d at 129.

The trial court did not err in refusing appellant's requested charge on voluntary manslaughter. *See Stevens v. State,* 671 S.W.2d 517, 522–23 (Tex.Crim.App.1984).

### Involuntary manslaughter

■ Involuntary manslaughter occurs when a person recklessly causes the death of another. *Lugo v. State,* 667 S.W.2d 144, 147 (Tex.Crim.App.1984); TEX.PENAL CODE ANN. § 19.05(a)(1) (Vernon 1989). A person acts recklessly when he or she is aware of, but consciously disregards, a substantial and unjustifiable risk the circumstances exist or the result will occur. *Lugo,* 667 S.W.2d at 147.

■ Appellant asserts his statement reflects that after he ran up to Stonecipher and tried to cut her throat, he backed up, closed his eyes, and swung the knife before pulling the knife out of her back, that all he wanted to do was to teach Stonecipher a lesson, and that he would never intentionally kill anyone. In addition, Beaubien testified that when appellant pulled the knife across Stonecipher's throat she appeared to be alive. Appellant argues this evidence indicates he acted recklessly, and thus was entitled to a jury instruction on involuntary manslaughter.

There is, however, no evidence appellant is guilty *only* of consciously disregarding a known substantial and unjustifiable risk that serious bodily injury would occur. *See Dowden v. State,* 758 S.W.2d 264, 271 (Tex.Crim. App.1988). Appellant admitted that he participated in planning the murder, that he voluntarily went in the field with the boys and Stonecipher, that he intentionally ran the knife across Stonecipher's throat, and intentionally stabbed her in the back with such force that he could not pull the knife from her back because it was "stuck." Further, there is no evidence in the record that appellant was *merely* acting recklessly or that his conduct did not cause Stonecipher's death. *See Epley v. State,* 704 S.W.2d 502, 506 (Tex. App.—Dallas 1986, pet. ref'd).

Because there is no evidence to show that appellant was guilty *only* of involuntary manslaughter, the trial court did not err in refusing appellant's requested jury charge. *See Dowden,* 758 S.W.2d at 271–72.

Appellant's third, fourth, fifth, and sixth points of error are overruled.

### Jury argument

In his seventh and eighth points of error, appellant argues the trial court erred in denying his motion for mistrial because the prosecutor urged the jury to consider the application of parole laws in assessing punishment.

■ In order to fall within the realm of proper jury argument, the argument must encompass one of the following areas: (1) summation of the evidence presented at trial; (2) reasonable deductions from the evidence; (3) answer to the opposing counsel's argument; or (4) a plea for law enforcement. *Gaddis v. State,* 753 S.W.2d 396, 399 (Tex. Crim.App.1988). Even where the argument is impermissible, it is not reversible unless, in light of the record as a whole, the argument

is manifestly improper, violative of a mandatory statute, or injects new facts, harmful to the accused in the trial proceeding. *Todd v. State,* 598 S.W.2d 286, 297 (Tex.Crim.App. 1980).

■■■ The prosecutor's final argument, in relevant part, consisted of the following:

Prosecutor: I'm asking that you assess a life sentence. Not because it is a vindictive thing to do, not because of revenge but because that is justice. It is justice for the life of [Stonecipher]. It is just for [appellant.] And it is to protect the people of Harris County.

You put him in a position where whatever the Board of Pardons and Paroles does, as it say in your charge, **whatever little time he stays—**

Defense counsel: Your honor, I'm going to object. That's an argument that is not permissible. It going in to areas that have not been brought into evidence and unconstitutional.

Court: You are instructed in your charge that it is not the judge's job as judges in either judge or courtroom to decide that question. And it is not your job to consider it in your deliberations. Please do not consider it for any purpose.

Defense counsel: We would further, because he's asking ... the jury to consider the parole laws, we would ask for a mistrial.

Court: Your request for mistrial is denied.

Prosecutor: I'm not asking you to consider the parole laws. I'm asking you to look at the law and see what it says, asking you to read what it says.

So there will not be any mistaking what I'm asking you, let me turn to it. You are not to discuss among yourselves how long the accused would be required to serve the sentence. Such matters come within the exclusive jurisdiction of the Board of Pardons and Parole Division of the Texas Department of Criminal Justice and the Governor of the State of Texas. You're not to discuss this. You are to leave that to the Board of Pardons and Paroles.

I'm saying this: How long a sentence he serves is not what I'm telling you. **You give him a term of years. You give him life so that he is—it is under the direction of the Board of Pardon and Paroles how long he serves.**

Defense counsel: I object again. He's continually arguing—concerning Board of Pardons and Paroles. He'll be under the Board of Pardons and Paroles for life. Clearly impermissible.

Court: The objection is overruled. But I think perhaps another subject would be appropriate.

The above highlighted portions of the prosecutor's argument are the specific statements of which appellant complains. He specifically argues that the trial court erred in, first overruling his motion for mistrial and, second, in overruling his subsequent objection after the trial judge instructed the jury not to consider parole laws in their deliberations.

■■■ We do not find that the prosecutor's argument was so manifestly improper so as to have deprived appellant a fair and impartial trial. It is true that it is improper for a prosecutor to affirmatively urge the jury to consider how long a defendant would actually be required to serve any punishment the jurors might impose. *Clark v. State,* 643 S.W.2d 723, 724 (Tex.Crim.App.1982). Not every mention of or reference to parole laws necessitates reversal. This is especially so when the statement is of such a nature that the impropriety can be cured by a prompt instruction from the trial judge. *Id.* at 725. As the record reflects, the trial judge promptly and specifically instructed the jury not to consider parole laws in assessing punishment.

The prosecutor's argument in the instant case did not ask the jury to consider parole laws in assessing punishment. Instead, the prosecutor was urging the jury to assess a lengthy penalty and to leave the question of parole laws to the Board of Pardons and Paroles as the jury was instructed to do in the court's charge. The prosecutor clarified his position by referring to the court's charge and reiterating that he was not asking the jury to consider parole laws. The prosecutor has the right to refer to the court's charge during argument and explain the law con-

tained in it. *See McClory v. State,* 510 S.W.2d 932, 934 (Tex.Crim.App.1974).

Appellant's seventh and eighth points of error are overruled.

## Sufficiency of the evidence

In his ninth point of error, appellant argues there is insufficient evidence, absent the testimony of accomplice witnesses, to support the conviction. Specifically, appellant contends that, absent his statements and the testimony of Arnold and Beaubien, there is insufficient evidence to connect him to the crime.

The trial court instructed the jury in its charge that both Arnold and Beaubien were accomplices. At trial, both Arnold and Beaubien testified. Both boys recounted their version of the events leading up to the murder of Stonecipher. Each implicated appellant as the person who had suggested killing Stonecipher and as the one who cut her throat and stabbed her in the back and neck. According to the autopsy, which was admitted into evidence, Stonecipher died as a result of stab wounds to the back. Thus, it is Arnold's and Beaubien's testimony that the State had the burden of corroborating to prove appellant's guilt beyond a reasonable doubt.

In determining the sufficiency of the evidence to corroborate the testimony of accomplices, we eliminate from consideration the accomplices' testimony, in this case that of Arnold and Beaubien, and examine the remaining evidence to ascertain whether it independently tends to connect appellant to the commission of the murder of Stonecipher. *Killough v. State,* 718 S.W.2d 708, 710 (Tex. Crim.App.1986). Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Reed v. State,* 744 S.W.2d 112, 127 (Tex.Crim.App.1988). All facts and circumstances in evidence may be viewed to furnish the necessary corroboration, and the corroborative evidence may be circumstantial or direct. *Granger v. State,* 683 S.W.2d 387, 392 (Tex.Crim.App.1984) *cert. denied,* 472

U.S. 1012, 105 S.Ct. 2713, 86 L.Ed.2d 728 (1985). As noted above, after eliminating from consideration the testimony of Arnold and Beaubien, the evidence tending to connect appellant to the murder of Stonecipher was blood stains discovered on the clothing worn by appellant on the night of the murder, the testimony of Ivey Blanton, and appellant's own statement.

Ivey Blanton testified that she knew appellant and that on November 20, 1989, she saw appellant and Drake at approximately 11:45 p.m. at her house. During their conversation, appellant told Blanton that he and Drake were going to Beaubien's house. Blanton testified that she knew Beaubien and appellant were friends.

Charles Linch, a trace evidence analyst, testified that the blood stains on appellant's pants were consistent by type with Stonecipher's blood type, that being "type O." Linch identified one of the stains on the right leg of appellant's pants as a "transfer stain," caused by the pants being "rubbed up against a bloody item rather than dropped down." Appellant, however, argues that the pattern of bloodstains found on the right leg of his pants was consistent with blood dripping from his finger. Appellant's contention is inconsistent with Linch's testimony. Linch testified that this blood stain, which was larger than the others, and a similar one on the other leg of the pants, could not have caused by blood dripping from appellant's finger. Linch testified that in fact it was true that certain spots of blood were attributed to "drop blood," but Linch expressed the opposite opinion as to the larger stains.

Even excluding appellant's statements, the evidence remaining in the instant case is sufficient to corroborate the accomplice witness testimony against appellant.

Appellant's ninth point of error is overruled.

## Notes taken by the jury

In his tenth point of error, appellant argues the trial court erred in permitting the jury, over defense counsel's objection, to take notes.

Following selection of the jury and prior to beginning testimony, the trial court told the jury the following:

Court: You may, by the way, take notes if you choose to. If you choose to take notes, you may not let any other person on the jury read them. You cannot read them to any other person on the jury.

Defense Counsel: I would object to the jury taking notes.

Court: Your objection is overruled.

. . . .

Court: I want you to understand that you don't have to take notes. When you do take notes then you should be aware—lawyers and I do this every day. I have learned in my job to listen and take notes at the same time. If you don't do that in your job, you must be aware that taking notes will take some percentage of you attention away from watching the witnesses. It will detract from your ability to focus on witnesses.

. . . .

Court: What your job is to be listening, to be aware of the testimony, and be ready to discuss it when you are deliberating.

The Court of Criminal Appeals has not provided courts with a rule on the subject of note-taking by the jury. However, in *Hollins v. State*, 571 S.W.2d 873, 881 (Tex.Crim. App.1978), the court stated that "[i]t clearly appears that in the absence of a statute the majority view in this country is that the matter of note taking by jurors and their subsequent use during deliberations is left to the sound discretion of the trial court." While the court declined to decide whether note-taking by jurors is error, it did hold that such error, if any, could be harmless. *Id.* at 883.

In *Hubbard v. State*, 809 S.W.2d 316, 320 (Tex.App.—Fort Worth 1991, pet. granted), the court held that the trial court did not abuse its discretion in permitting jurors to take notes. The court stated that it did not view the juror notes per se as injecting additional evidence outside the record. *Id.* at 321.

■ Appellant has not shown us in what manner the notes were used by the jurors or that any of the jurors actually took notes during testimony. There is nothing in the record to show or indicate that, if the jury did take notes, that the jury made improper use of the notes during deliberations. Moreover, the trial court explained to the jury the proper use of notes during jury deliberation.

Appellant cites us to no express prohibition preventing jurors from taking notes, and we find none. We find the trial court did not abuse its discretion in instructing the jury that they could take notes.

Appellant's tenth point of error is overruled.

The judgment is affirmed.